Filed 12/18/23  In re U.M. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re U.M., a Person Coming Under the Juvenile Court Law. | B325187; B318563 |
| | (Los Angeles County Super. Ct. No. 21CCJP05786A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. VANESSA G., Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

––––––––––––––––––––

## INTRODUCTION

The Los Angeles County Department of Children and Family Services (Department) filed a dependency petition pursuant to Welfare and Institutions Code[1] former section 300, subdivisions (a) (serious physical harm inflicted nonaccidentally), (b)(1) (failure to protect), and (j) (abuse of sibling) in December 2021 on behalf of U.M. (born April 2010) and his siblings. The petition was based on physical abuse of U.M. by his mother Vanessa G. and his parents' limited ability to meet U.M.'s mental and behavioral health needs.

At the combined jurisdiction and disposition hearing in February 2022 the juvenile court sustained the petition as to U.M. but not his siblings, declared U.M. a dependent of the court, released him to the custody of both parents, and ordered family maintenance services. Vanessa G. appealed the jurisdiction findings and disposition orders (B318563), contending there was insufficient evidence to support a finding U.M. was at substantial risk of serious physical harm by the time of the jurisdiction

---

[1]     Statutory references are to the Welfare and Institutions Code.

2

hearing and that Vanessa was unable or failed to provide appropriate care and supervision to U.M. given his mental and emotional issues.

Subsequently, in July 2022 the Department filed a section 342 petition on behalf of U.M., under former section 300, subdivisions (a) and (b)(1), alleging new circumstances of physical abuse of U.M. by Vanessa in May 2022.[2] At the combined jurisdiction and disposition hearing on the section 342 petition in October 2022, the juvenile court sustained the petition, removed U.M. from Vanessa and placed him with his father Ul.M. with monitored visits with Vanessa, and ordered family maintenance services and enhancement services for Vanessa. Vanessa appealed the jurisdiction findings and disposition orders (B325187), contending there was insufficient evidence to support a finding U.M. suffered serious physical harm from Vanessa's physical discipline or that he was at substantial risk of serious physical harm by the time of the jurisdiction hearing on the section 342 petition.

---

[2] Section 300, subdivision (b)(1), formerly provided, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." Effective January 1, 2023, Senate Bill No. 1085 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 832, § 1) amended section 300 by rewriting subdivision (b)(1) to enumerate the existing bases for dependency jurisdiction in separate subparagraphs (b)(1)(A) through (D).

We address both appeals in this combined opinion and affirm in each case.[3]

**FACTUAL AND PROCEDURAL BACKGROUND**

A.   *Prior Referrals and Dependency Proceedings*

In December 2010 the juvenile court took jurisdiction of U.M. and his older sister K.V. due to domestic violence between Ul.M. and Vanessa and Ul.M.'s substance abuse. K.V. was placed with her father, and the court granted Vanessa and Ul.M. reunification services as to U.M. In July 2011 U.M. was placed with Vanessa and in January 2012 the court terminated jurisdiction, granting her physical custody of U.M with monitored visits to Ul.M.

In February 2015 a referral in Riverside County alleged Vanessa hit K.V. and U.M. at a restaurant. K.V. said Vanessa hit her thigh four times and then hit U.M.; U.M. dropped a cup, and K.V. said Vanessa then threw the cup at U.M. causing a black eye. K.V. said that while driving home, Vanessa hit her again at a red light, and the reporting party took photos of red marks on K.V.'s thigh. The referral was substantiated, a court case was initiated, and the children were detained from Vanessa. In May 2016 the children were returned to Vanessa.

In August 2015 the juvenile court took jurisdiction of U.M., then five years old, and his younger sibling S.L. due to physical abuse of U.M. by Vanessa. U.M. was placed with his paternal grandparents, and S.L. was released to her father, Ul.M. Vanessa completed reunification services, U.M. and S.L. were

_____

[3]   U.M.'s father Ul.M did not appeal after either hearing.

4

returned to Vanessa's custody, and the juvenile court terminated jurisdiction in August 2016.

In 2019 after a referral accusing Vanessa of physical abuse was initially deemed "inconclusive," a case was opened for voluntary family maintenance services with siblings U.M., S.L., and A.L. U.M., then nine years old, stated Vanessa hit him and yelled at him, pulled him by his hoodie, choked him, and slapped him in the face. The reporter stated Vanessa banged U.M.'s head on the wall. U.M. had a scratch on his left eye and redness to the right side of his face. The physical abuse was ongoing on a weekly basis, and U.M. stated he was fearful of Vanessa and of going into foster care if he reported her abuse. U.M. reported he felt he deserved mistreatment from Vanessa because he talked back and visited his father on Sundays. The family was ultimately deemed stabilized with services and the case was closed.

Later in 2019 another referral for physical abuse was deemed inconclusive after U.M. reported Vanessa "cussed" at him, gave him the middle finger, threw him to the ground, and punched him. Vanessa denied the allegations. Other individuals noted U.M.'s behavior could quickly escalate and become aggressive and explosive, and that Vanessa triggered U.M.'s behavior and caused him to escalate. The social worker was informed U.M. attempted to "'choke'" Vanessa while she was driving. When Vanessa attempted to video record his behavior, U.M. reportedly attempted to run away and then hit her with a stick. Individuals reported U.M. alleged abuse by Vanessa in the hopes he would be placed with his father.

5

In November 2020 a referral alleged that U.M. disclosed during a Zoom learning day that Vanessa hit S.L. hard, then S.L. hit U.M. for no reason. U.M. then reportedly said that Vanessa threw a water bottle, kicked U.M., and threw him on the floor. U.M. said Vanessa screamed at him and "smacked" him for hitting S.L. and threw his phone on the floor. During the Department's investigation U.M. said Vanessa did not actually hit him or his siblings, and he just wanted to get Vanessa's attention because he was upset with her. He had no visible marks or bruises; Vanessa denied the allegations. No evidence indicated U.M. was abused.

B.    *The February 2022 Jurisdiction Findings and Disposition*

In October 2021 the Department received two referrals concerning U.M. One reported U.M. was watching pornography and said his father had shown him pornography; the second was made after U.M. reported to school staff that Vanessa hit him with objects including a belt.

U.M. stated that Vanessa hit him with a belt all over his body. U.M. also reported getting hit on the shoulder when Vanessa threw a phone at him because he used up all of the hot water during his shower, the floor was wet, and Vanessa blamed him for causing extra work. U.M. reported having a bruise on his leg. No bruise was observable, but U.M. had a drawing on his thigh he stated he drew on himself so the bruise could not be seen. U.M. appeared well-groomed, healthy, and dressed appropriately, with no visible marks or bruises. U.M.'s school counselor stated U.M. told her about the abuse at home and said he drew on his leg to hide a bruise. U.M. stated Vanessa threw her shoe and other objects at him, like water bottles and a brush,

6

almost every day.  He reported Vanessa also called him vulgar sexualized names.  Vanessa told the Department she understood the need to refrain from using physical discipline and agreed to services.

In early November 2021 the Los Angeles County Sheriff's Department, Norwalk station, informed the Department that U.M. had reported abuse by Vanessa.  On November 3, in an interview at his school with a sheriff's deputy, U.M. reported Vanessa disciplined him by hitting him with different objects and called him names.  He reported that two to three weeks prior, Vanessa became mad at him when his sister fell off the couch while playing and hit him with a belt on his back four to five times.  Vanessa also hit him with a belt approximately three to four times on his back because his sister fell and hurt her knees while running.  A day or two before the previous incident, Vanessa hit him on the back of his head with the back of her hand and pushed him to his room when he noticed an unknown substance on the floor.  He stated Vanessa constantly called him vulgar names.  The deputy found U.M.'s statements "inconsistent" and noted U.M. could not provide "dates or details of the abovementioned incidents."  The deputy observed a two-inch bruise on U.M.'s back above his waistline; U.M. was unsure if it was from the belt.  The deputy also observed a two-inch scratch; U.M. was unsure where he got that but stated two scratches on his neck were from playing with his sisters.

Later the same month, Vanessa informed the Department she had called the police because U.M. was violent with her and U.M.'s sisters.  A social worker went to the home and saw U.M. in the back of a sheriff's car.  The deputy stated U.M. was being assessed for a psychiatric hold due to a threat to harm himself.

U.M. had expressed he had no reason to live due to his home circumstances. Vanessa stated U.M. went into "a fit of rage" after she forbade him from playing in the front yard then closed himself in a room with his sisters with a baseball bat, and she called the police because she did not know what to do. S.L. later described U.M. hitting the couch and wall with a bat, then threatening his sisters in a room with the bat and stating he wanted to kill himself. U.M. later confirmed locking himself in a room with his sisters with a bat after Vanessa made him angry.

U.M. was hospitalized in a psychiatric facility from November 23 to 30, 2021. After his release, U.M. stated he said "all those things about his mom hitting him" because he wanted to live with his dad, and that he knew he had to live with his mom until age 18 and wanted to stop lying.

On December 21, 2021 the Department filed a petition alleging U.M., S.L., and A.L. came within section 300. The Department alleged in counts a-1, b-1, and j-1 that Vanessa physically abused U.M. by striking him with a belt on his buttocks and back; on a prior occasion, she threw a phone at his shoulder; and on prior occasions, she pulled his hair, struck him with an open hand on his head, pushed him, and hit him with objects including belts, shoes and hangers; and that U.M. and S.L. were prior dependents of the court due to inappropriate physical discipline of U.M. such that the siblings S.L. and A.L. were at risk of harm. The Department further alleged in counts b-2 and j-2 that Vanessa and Ul.M. had limited ability to provide U.M. with appropriate care due to his mental and emotional problems and aggressive behavior toward others; that U.M. was involuntarily hospitalized from November 23 to 30, 2021 due to being a danger to himself and others; and his parents' actions put

8

U.M. and his two younger sisters, eight-year-old S.L. and four-year-old A.L., at risk of physical harm. At the detention hearing on December 23, 2021 the juvenile court released U.M. to both parents. In January 2022 U.M. told the dependency investigator he did not want to live with Vanessa and instead wanted to live with his father in Arizona. Regarding physical discipline, he stated Vanessa previously would "smack me in the butt with her open hand[, b]ut when [Vanessa and his stepfather] started putting cameras around the house, they only yell at me." He said Vanessa used to hit him with her open hand "wherever she gets me because I would be running from her," and also used to hit him with shoes, a water bottle, and the phone. He further reported Vanessa "smacked" him on the back and on his head.

U.M.'s sister A.L. reported Vanessa "[']smacked [U.M.] on his butt and back. She also takes away his phone and tablet. [U.M.] gets hit with a 'cinto' (belt) by mom.'" She reported the belt was "brownish and blackish" and belonged to "'my dad.'"

Vanessa denied abusing U.M. and said U.M. knew what to say to retaliate against her. Vanessa stated U.M.'s abuse allegations were "'all a lie. He is very manipulative'" and that U.M. "'has a tendency of exaggerating things and choosing words that make it seem like he's being abused.'" Vanessa expressed not knowing what to do or how to cope with her son's meltdowns and challenging behavior. She reported U.M. threatened to file reports and hit himself to inflict bruises. Vanessa did not know how to handle U.M.'s behaviors but felt the Department's involvement gave U.M. a sense of entitlement and stripped her from being able to parent her son. Vanessa believed U.M.'s behavior had gotten worse since the Department came back into their lives. She felt prior case services helped but U.M. also knew

9

"'what to say to get [her] in trouble.'" U.M.'s stepfather reported U.M. always threatened to tell social workers Vanessa abused him when things did not go his way.

At the combined jurisdiction and disposition hearing on February 15, 2022 the juvenile court dismissed the petition as it related to U.M.'s two younger sisters and sustained the petition as to U.M.[4] The juvenile court declared U.M. a dependent of the

---

[4] The sustained counts, with amendments, were as follows:

"[Counts a-1 and b-1]: On prior occasions, the child[] [U.M.]'s mother[]inappropriately physically disciplined the child U.M. by striking the child with a belt on the child's buttocks and back. On a prior occasion, the mother threw a phone at the child's shoulder. On prior occasions, the mother pulled the child's hair, struck the child with an open hand to the back of the child's head and pushed the child. On prior occasions, the mother struck the child with objects including belts, shoes and hangers. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child[] [U.M.] is a prior dependent of the Juvenile Court due to the mother's inappropriate physical discipline of the child [U.M.]. Such inappropriate discipline of the child by the mother endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger, and physical abuse.

"[Count b-2]: The . . . mother[] and . . . father of the child, [U.M.], have a limited ability to provide the child, [U.M.] with appropriate ongoing care and supervision due to the child's mental and emotional problems and aggressive behaviors towards others. The child was involuntarily hospitalized from 11/23/2021 to 11/30/21 due to the child being a danger to self and others. Such a limited ability to provide appropriate parental care and supervision for the child on the part of the parents,

10

court, released him to the custody of both parents, and ordered family maintenance services.

Vanessa timely appealed the jurisdiction findings and disposition orders (B318563).

C. *The Section 342 Petition, and the October 2022 Jurisdiction Findings and Disposition*

In May 2022 the Department received a referral alleging Vanessa physically abused U.M. In July 2022 the Department filed a subsequent petition pursuant to section 342 on behalf of U.M., under section 300, subdivisions (a) and (b)(1). The petition alleged for both counts: "On or about 05/24/2022, the child's mother physically abused the child by repeatedly striking the child. The mother grabbed the child by the child's hair and dragged the child, causing the child's hair to fall out. The child sustained a scratch and bruising to the child's legs. Such physical abuse was excessive and caused the child unreasonable pain and suffering. Such physical abuse of the child by the mother endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger, and physical abuse."

Vanessa initially refused to allow a social worker to enter or to cooperate with the Department investigators who arrived to investigate the referral. The following day she agreed to questioning and stated U.M. hit her in the face during an argument over his homework and music, then he went to the neighbors. She denied pulling his hair. The social worker took

---

endangers the child's physical health, safety, and well-being and places the child [sic]."

11

photos of Vanessa's face when Vanessa stated U.M. punched her, but the worker did not see any marks or bruises. Vanessa stated U.M. had a tendency to call for help after verbal altercations so the neighbors believed she was hitting him. Vanessa stated she was unable to discipline U.M. and was afraid for the safety of herself and her daughters. Vanessa attributed U.M.'s behavior to his father's influence, saying that Ul.M. told U.M. she did not love him and he should not have to listen to his stepfather. At subsequent interview attempts, Vanessa declined to allow interviews with her daughters and stated U.M.'s stepfather was not available. Vanessa blamed the allegations on the Department blaming her and for "'trying to open a case and get kids removed.'"

The neighbor, A.G., reported U.M. came to his house crying and saying that "'his mom dragged him by his hair and sent him to do his homework at my house.'" A.G. stated he believed U.M. because U.M. "ran his fingers through his hair and he was shedding a lot of hair.'" The neighbor reported this was not the first time U.M. ran to his house complaining about being hit by Vanessa. He stated he had heard U.M. yelling from across the street and he was concerned for U.M.'s safety in Vanessa's care.

U.M. told his social worker Vanessa told him to go to his desk while he was working on a school assignment on the floor. They argued and Vanessa got close to his face telling him "'is this the life you want to live,'" he pushed her away and they had a scuffle. Vanessa cursed at him, grabbed him by his hair and told him to leave. The social worker observed U.M. had red spots on his head.

U.M. later elaborated Vanessa became upset and started hitting him when he did not follow her instructions about listening to music during his test. Vanessa grabbed and pulled him by the hair and dragged him to the floor and out of the home while cursing at him, and she hit his arm with her hand. Vanessa told him to go take his test and listen to music at the neighbor's house, and he walked over to the neighbor's house. When he got to the neighbor's house, he touched his head and he was shedding hair from Vanessa pulling his hair. He reported he also had a scratch and some bruising on his legs. U.M. reported he also hit Vanessa in their altercation, possibly on her face. He reported that this was not the first time Vanessa used physical contact on him. The interviewing social worker asked why he did not share past abuse with his usual social worker. He responded, "'[B]ecause I was scared that they would take me to foster care.'" U.M. reported feeling unsafe returning to Vanessa's care and said, "'[N]o, I am scared that she does the same thing again and I feel down at my mom's house.'"

U.M. called his father Ul.M. in Arizona asking him to pick him up from the neighbor's house. Ul.M. conferred with the social worker and drove from Arizona the next day to pick up U.M. U.M. told his father Vanessa kicked him out of her house and hit him. Ul.M. reported he asked U.M. why Vanessa did that and U.M. said Vanessa was upset he was playing music while taking an exam and started hitting him. U.M. had faded bruising on his back and thigh.

The Department sought and obtained a removal order and detained U.M. from Vanessa while releasing him to Ul.M.

At the detention hearing in August 2022 the juvenile court detained U.M. from Vanessa's care and released him to Ul.M., with monitored visits for Vanessa.

Additional evidence at the time of the combined jurisdiction and disposition hearing on October 26, 2022 included that U.M. reported this was not the first time Vanessa dragged him by the hair; she hit him and pulled his hair many times and screamed and cursed at him all the time. He stated that he was six or seven years old when conflicts began with Vanessa. His social worker reported that in the past, U.M. told her Vanessa pulled his hair then recanted and said he made it up because he was upset. When asked why he recanted in the past by making physical abuse allegations against Vanessa and then saying he lied, U.M. replied he was afraid to go to foster care. U.M. reported being afraid of Vanessa and did not want to come back to Vanessa's home "'because she will do it again.'"

The social worker who investigated and substantiated the family's referral in October 2021 was interviewed and gave her opinion that U.M.'s acting out behaviors were escalating due to the home situation between him and Vanessa. She was concerned for U.M.'s safety in Vanessa's care and stated that it was due time to detain U.M. from Vanessa, "'There is only so many times a kid can say he is being hit and we are not listening.'" The social worker who investigated the family's prior referral from March 2022 also stated there were red flags to suspect physical abuse on U.M. by Vanessa but U.M. recanted about being pulled by the hair by Vanessa. U.M.'s residential treatment therapist shared that U.M. informed her a few times

14

Vanessa hit him, then would recant and say it was a long time ago or say he lied about the allegations.

U.M.'s stepfather stated U.M. was disrespectful, manipulative, and physically abusive towards Vanessa and made false allegations of physical abuse against Vanessa in the past and had a history of lying. He would lash out when things did not go his way and had broken doors and made holes in the walls while upset. The stepfather reported that U.M. had learned to manipulate everyone and it worked because now he was residing with his father. U.M.'s maternal grandmother stated U.M. had a history of being verbally and physically aggressive towards Vanessa. U.M. was aggressive towards maternal grandmother on an occasion when she was watching him and asked him to give her cell phone back. He became upset and began to scream and curse at her, use curse words, scratched her new car with a stick, and grabbed a pair of scissors and threatened to kill her. She believed U.M. suffered from significant mental health issues.

As a result of its investigation, the Department concluded U.M. was at high risk of continued physical violence in Vanessa's home.

Before the disposition hearing, U.M. was interviewed and reconfirmed Vanessa dragged him by the hair on the day of the incident and used physical discipline in the past. In her interview, Vanessa initially said she would only answer "yes" or "no" questions, denied hitting U.M., reiterated that U.M. punched her, and stated that the paternal family was hindering U.M.'s therapeutic services. Vanessa repeated her previous sentiment about the Department not supporting her, stating, "'I feel that no matter what I say you guys already know and say what you guys want.'" Vanessa was unable to explain if she had learned

15

anything from her parenting class that she had since implemented with U.M. The social worker reported Vanessa was compliant with her court-ordered case plan yet she had not put anything she should have learned into practice.

At the jurisdiction and disposition hearing the juvenile court sustained the section 384 petition, removed U.M. from Vanessa and placed him with Ul.M. with monitored visits with Vanessa, and ordered family maintenance services for both parents and enhancement services for Vanessa.

Vanessa timely appealed the jurisdiction findings and disposition orders (B325187).

## DISCUSSION

A. *Governing Law and Standard of Review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re A.F.* (2016) 3 Cal.App.5th 283, 289; see also *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

"Section 300, subdivision (a), provides that jurisdiction may be assumed if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally by the child's parent or guardian." (*In re Cole L. (*2021) 70 Cal.App.5th 591, 601.) "'Nonaccidental' generally means a parent or guardian 'acted intentionally or willfully.'" (*Ibid.*; accord, *In re R.T.* (2017) 3 Cal.5th 622, 629.)

16

Former section 300, subdivision (b)(1), authorized the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child" or by the "willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment" or by the "inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  "A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements:  (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L., supra,* 70 Cal.App.5th at p. 601; accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see *In re R.T., supra,* 3 Cal.5th at p. 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

At the jurisdiction hearing the juvenile court determines whether the allegations that the child comes within section 300 (and thus within the juvenile court's jurisdiction) are true, based on a preponderance of the evidence.  (See § 355.)  If the court finds jurisdiction under section 300, it proceeds to disposition.

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L., supra,* 70 Cal.App.5th at pp. 601-602; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"].) "A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*In re Cole L.,* at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

After the juvenile court has assumed jurisdiction, "[]in any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances . . . sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." (§ 342, subd. (a); see *In re Barbara P.* (1994) 30 Cal.App.4th 926, 933 ["When a minor has been declared a dependent child and the department alleges new facts or circumstances sufficient to find that the minor should be found to be a dependent child, the department files a subsequent petition, alleging the new information."].) "[A]ll procedures and hearings required for an original petition are applicable to a subsequent petition filed under this section." (§ 342, subd. (b).)

We review the juvenile court's jurisdiction findings for substantial evidence in light of the whole record. (*In re I.C.* (2018) 4 Cal.5th 869, 892 ["the evidence supporting the jurisdictional finding must be considered "'in the light of the

18

*whole record*" 'to determine whether it discloses substantial evidence'"]; *In re R.T., supra,* 3 Cal.5th at p. 633 ["'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.'"].) Substantial evidence is "'evidence which is reasonable, credible, and of solid value.'" (*In re I.C.,* at p. 892; accord, *In re Cole L., supra,* 70 Cal.App.5th at p. 602.) "'[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.,* at p. 633; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Cole L.,* at p. 602 ["while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding"].) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

B.      *Substantial Evidence Supports the February 2022 Jurisdiction Findings and Disposition Orders*

Vanessa concedes that she used physical discipline on U.M., but contends there was not substantial evidence to support the jurisdiction findings under section 300, subdivision (a), that U.M. was at substantial risk of physical harm as a result of Vanessa's physical abuse of him or, under subsection (b)(1), that at the time of the jurisdiction hearing he had suffered or had a substantial risk of suffering serious physical harm or illness as a result of her physical discipline of him.

19

We conclude substantial evidence supports the jurisdiction findings based on Vanessa's physical abuse of U.M.  As outlined above in greater detail, U.M. reported that Vanessa hit him with shoes, a water bottle, a phone, and a belt, as well as an open hand.  A sheriff's deputy observed a bruise on U.M.'s back above his waistline, consistent with where he stated he was hit with the belt.  U.M.'s younger sister A.L. also stated Vanessa hit U.M. with a belt.  The juvenile court credited A.L.'s corroboration of the allegation Vanessa hit U.M. with a belt.  A.L. reported Vanessa "[']smacked [U.M.] on his butt and back. . . . [U.M.] gets hit with a 'cinto' (belt) by mom.'"  She reported the belt was "brownish and blackish[,]" and belonged to "'my dad.'"  U.M.'s stepfather subsequently wore the belt matching A.L.'s description during his interview with the dependency investigator.  He commented "'there is only one belt and that's the one I use.'"

Moreover, Vanessa's failure to acknowledge her physically abusive conduct further supports the juvenile court's finding her physical abuse created a substantial risk of harm to U.M.  (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."]; accord, *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision."].)

The record also supports jurisdiction under former section 300, subdivision (b)(1), because U.M. "faced an ongoing risk of harm based on h[is] increasingly self-destructive behavior,

behavior that mother simply could not control." (*In re R.T., supra,* 3 Cal.5th at p. 634 [jurisdiction upheld under subd. (b)(1) where mother admitted inability to discipline or control minor's "rebellious" and "incorrigible" behavior of "acting out" and running away].)  The record reflects U.M. and Vanessa had a longstanding pattern of conflict that exacerbated U.M.'s behavioral problems, including suicidal ideation, threatening family members, and self-harm.  Vanessa blamed his refusal to submit to her parental authority for their problems and admitted she could not control him. "Whether it was [U.M.]'s misbehavior and disobedience, or mother's inability to supervise or protect [U.M.], that initiated this cyclical pattern of conflict, does not matter here.  The basis for jurisdiction under section 300(b)(1) is whether the child is at 'substantial risk' of 'serious physical harm or illness.' . . . [G]iven the substantial risk of harm that [U.M.] faced, there is little question that mother was unable to 'adequately' supervise or protect [U.M.] as required under section 300(b)(1)." (*Id.* at pp. 634-635.)

Because substantial evidence supports dependency jurisdiction under section 300, subdivisions (a) and (b)(1), based on Vanessa's physical abuse of U.M., we need not consider the other basis for jurisdiction—the parents' failure or inability to provide appropriate care and supervision to U.M. given his mental and emotional issues, under section 300, subdivision (b)(1).[5]  (See *In re I.J., supra,* 56 Cal.4th at p. 773

---

[5]     The Department contends Vanessa's jurisdictional contentions should be dismissed as nonjusticiable because she does not challenge the jurisdiction findings regarding Ul.M.'s limited ability to provide ongoing care and supervision to U.M.

["'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all the other alleged statutory grounds for jurisdiction are supported by the evidence.'"]; accord, *In re J.N.* (2021) 62 Cal.App.5th 767, 774; *In re Madison S.* (2017) 15 Cal.App.5th 308, 328-329.)

C.      *Substantial Evidence Also Supports the October 2022 Jurisdiction Findings and Disposition Orders*

We conclude substantial evidence also supports the jurisdiction findings based on Vanessa's subsequent physical abuse of U.M. alleged in the section 364 petition.

Here, Vanessa claimed and U.M. did not dispute they had a physical altercation in which 12-year-old U.M. apparently hit Vanessa in the face. As outlined above in greater detail, U.M.

---

"[W]here jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283.) However, where, as here, "a case is moot because one parent appealed and not the other, but the findings against the parent who has appealed are based on more serious conduct, it may serve the interest of justice to review the parent's appeal." (*Id.* at p. 286; see *id.* at p. 282 [reviewing court has "'inherent discretion'" to reach the merits of an appeal even where case is moot].) Accordingly, we exercise our discretion to consider Vanessa's jurisdictional contentions on the merits.

stated that Vanessa grabbed his hair and pulled it as she made him leave the home, while she cursed at him. Vanessa denied pulling his hair, but the reporting party spoke with U.M.'s sibling, who confirmed Vanessa pulled U.M.'s hair. The neighbor, A.G., stated that when U.M. arrived at his home, U.M. ran his hand through his hair and it was "shedding." This was not the first time U.M. had complained to A.G. about Vanessa hitting him. A Department social worker saw red spots on U.M.'s head the following day and that he was still shedding hair. U.M. and Ul.M. reported that U.M. had bruises on his legs, back and thigh area, after the May 25, 2022 incident.

Under these circumstances, Vanessa's response was not appropriate discipline. Pulling a 12-year-old child out of the house by his hair until it is falling out, leaving red spots on the child's scalp still visible the next day, is not reasonable disciplinary conduct. Such a response from a parent is unwarranted, even if the child struck the adult in the face during an argument, and is excessive punishment under the circumstances. Use of physical force to this extent against U.M. is also indicative of Vanessa's reluctance or inability to put into practice her court-ordered skills programs ordered at the section 300 disposition, despite the juvenile court having already made findings about the risk of harm to U.M. from Vanessa's physical abuse. Vanessa's denial about the effects of her actions on U.M. is also relevant. (See *In re Gabriel K., supra,* 203 Cal.App.4th at p. 197 ["One cannot correct a problem one fails to acknowledge."]; see also *In re Esmeralda B., supra,* 11 Cal.App.4th at p. 1044 [a parent's denial of a problem may be probative to the determination of whether he or she is likely to modify the behavior in the future].) Rather than implementing

23

appropriate skills or disciplinary strategies, Vanessa blamed U.M.'s father's family for the current allegations, accused the Department of a scheme designed to "'try[] to open a case and get kids removed,'" and refused access to investigators.

Accordingly, substantial evidence exists supporting the juvenile court's findings that Vanessa physically harmed U.M. and that he remained at risk of harm, warranting jurisdiction under section 300, subdivisions (a) and (b)(1).

## DISPOSITION

The jurisdiction findings and disposition orders entered on February 15, 2022 and October 26, 2022 are both affirmed.

MARTINEZ, J.

We concur:

SEGAL, Acting P. J.

FEUER, J.

24